[No. 40073-8-I. Division One. August 17, 1998.]

DAVID DANIELS, ET AL., *Appellants*, v. SEATTLE SEAHAWKS, ET AL., *Respondents*.

*William D. Marler* and *Denis W. Stearns*, for appellants.

*Daniel F. Mullin* of *Abbott, Davis, Rothwell, Mullin & Earle, P.C.*, for respondents.

WEBSTER, J. — David Daniels, a former Seattle Seahawks football player, filed suit against Dr. Merrit K. Auld, one of the Seahawks' team physicians, for negligence in the diagnosis and treatment of his work-related injury. Dr. Auld successfully moved for summary judgment under the Industrial Insurance Act's (IIA or the Act) immunity provision for coemployees. Daniels appeals, arguing that although Dr. Auld performed his duties under an employment agreement with the Seahawks, genuine issues of material fact exist as to whether: (1) Dr. Auld's work for the Seahawks constitutes employment under the IIA's

alternative exception to the Act's "worker" definition, RCW 51.08.195; (2) Dr. Auld is not an employee but an independent contractor; and (3) either the dual capacity or dual persona doctrines permit his negligence suit. But Daniels fails to raise genuine issues of material fact demonstrating RCW 51.08.195's applicability or that despite an employment agreement, Dr. Auld is an independent contractor. Neither are we persuaded to extend the dual capacity or dual persona doctrines here. Accordingly, we affirm.

## FACTS

The Injury

While playing football for the Seattle Seahawks in September 1992, David Daniels sustained an injury. He reported to the team's trainer, complaining of a "groin pull." He was treated and returned to the field, but did not continue playing because of the severity of the injury.

The next day, Daniels was examined by the trainer and Dr. Merrit K. Auld, an orthopedic surgeon and one of the team's physicians. Dr. Auld put Daniels on a treatment regime, but Daniels never fully recovered from his injury. He later learned that he had fractured his left rectus femoris. The Seahawks later traded Daniels to another professional football organization, who released him shortly thereafter. Daniels no longer plays professional football.

Daniels filed suit against Dr. Auld for negligence.[1] But Dr. Auld moved for summary judgment, claiming co-worker immunity under Washington's Industrial Insurance Act.

Dr. Auld's Professional Relationship With The Seahawks

Before 1991, Dr. Auld was an independent contractor physician for the Seahawks; he had a fee-for-service relationship with the team. But at the time of Daniels's injury, Dr. Auld had an "Employment Agreement" with the Sea-

---

[1]At the summary judgment hearing, Daniels stipulated that he was an employee of the Seattle Seahawks and that his injury was work-related.

hawks, and was paid an annual salary. At the time the agreement was negotiated, Dr. Auld's insurance company newly required its athletic team physicians to obtain such employment agreements. Consequently, Dr. Auld had to either secure the agreement or to quit working for the Seahawks. And the Seahawks were required by both the players' contracts and the National Football League Players' Association to have an orthopedic surgeon available to players. Although Dr. Auld knew that entering into the employment agreement might provide immunity from players' negligence actions, he described that knowledge as a "small part of the whole picture" of reasons motivating the agreement.

Among other terms, the agreement required the doctor to treat all Seahawks' employees, excluding internal medicine needs. He attended scouting camp, minicamp, training camp, all pre-, post-, and regular season games, and was on call at all times. Dr. Auld was also expected to perform surgeries, but the agreement specifically exempted a surgical suite from the necessary equipment provided by the Seahawks. Although Dr. Auld occasionally used his own facilities for the convenience of the Seattle Seahawks or the Seattle Seahawks' employees, Dr. Auld did not bill and was not reimbursed by the Seahawks on these occasions. All other office, tools, equipment, and assignments were provided by the Seahawks. Dr. Auld maintained his own professional licenses, except membership in the Professional Football Doctors Association, which the Seahawks paid. The agreement also said:

> Dr. Auld will perform duties relating to administrative procedures including hours of work, travel expenses, attendance at the games and the combine, and the like under the direction and control of the Seattle Seahawks. Dr. Auld, however, will be solely responsible for exercising his independent medical judgment as to all decisions on medical care and methods of treatment of Seattle Seahawks employees.

Clerk's Papers at 52, 185.

This employment arrangement resulted in approximately

60 percent of Dr. Auld's work hours from July to January. The remainder of the doctor's work time was spent at his private practice, Orthopedics International, where he was a shareholder. Dr. Auld did not treat Daniels at his private facilities, but there were times when he did treat other Seahawks' employees as described in the agreement. On other occasions, other doctors at Orthopedics International "filled in" for Dr. Auld to treat Seahawks' employees at this independent facility, acting as consultants to the Seahawks.

The Seahawks kept all accounting for Dr. Auld's work under the agreement, while Dr. Auld kept a separate accounting for his private practice. The Seahawks also handled Dr. Auld's tax forms (for example, W-2s), work-related reimbursements, and paid his Workers' Compensation benefits to the State. By the employment agreement's terms, the Seahawks were responsible for filing "all documents and pay[ing] all taxes and premiums which [they] were required by law to file or pay as Dr. Auld's employer." Clerk's Papers at 53. Dr. Auld had no separate accounts with any Washington agencies for work he performed for the Seahawks. Moreover, as the Seahawks' part-time employee, Dr. Auld received no health insurance, sick leave, life insurance benefits, or vacation pay, and was not entitled to participate in the team's 401(k) or other retirement programs.

On the Seahawks' motion for summary judgment, the trial court dismissed Daniels's claims. Daniels timely appeals.

## DISCUSSION

In ruling on a motion for summary judgment, the court must consider the material evidence and all reasonable inferences in the light most favorable to the nonmoving party. *See* CR 56(e). If there are genuine issues of material fact, and reasonable persons might reach different conclusions, the motion should be denied. *See Novenson v.*

*Spokane Culvert & Fabricating Co.*, 91 Wn.2d 550, 552, 588 P.2d 1174 (1979).

Industrial Insurance Act Co-Worker Immunity

 Under Washington's Industrial Insurance Act both employers and co-workers are immune from common-law suit by an injured worker. *See generally*, RCW 51.04.010; *see also DuVon v. Rockwell Int'l*, 116 Wn.2d 749, 753, 807 P.2d 876 (1991). But the Act permits suits against third parties if such third person is "not in a worker's same employ." RCW 51.24.030(1). Although the Act does not define "same employ," it does define worker and provides an alternative exception to that definition.

> "Worker" means every person in this state who is engaged in the employment of an employer under this title, whether by way of manual labor or otherwise in the course of his or her employment; also every person in this state who is engaged in the employment of or who is working under an independent contract, the essence of which is his or her personal labor for an employer under this title, whether by way of manual labor or otherwise, in the course of his or her employment, or as a separate alternative, a person is not a worker if he or she meets the tests set forth in subsections (1) through (6) of RCW 51.08.195[.]

RCW 51.08.180(1). The "alternative" worker definition of RCW 51.08.195 became law in 1992, and provides:

> As a separate alternative to the . . . definition of "worker" under RCW 51.08.180, services performed by an individual for remuneration shall not constitute employment subject to this title if it is shown that:
>
> (1) The individual has been and will continue to be free from control or direction over the performance of the service, both under the contract of service and in fact; and
>
> (2) The service is either outside the usual course of business for which the service is performed, or the service is performed outside all of the places of business of the enterprise for which the service is performed, or the individual is responsible, both under the contract and in fact, for the costs of the principal place of business from which the service is performed; and

(3) The individual is customarily engaged in an independently established trade, occupation, profession, or business, of the same nature as that involved in the contract of service, or the individual has a principal place of business for the business the individual is conducting that is eligible for a business deduction for federal income tax purposes; and

(4) On the effective date of the contract of service, the individual is responsible for filing at the next applicable filing period, both under the contract of service and in fact, a schedule of expenses with the internal revenue service for the type of business the individual is conducting; and

(5) On the effective date of the contract of service, or within a reasonable period after the effective date of the contract, the individual has established an account with the department of revenue, and other state agencies as required by the particular case, for the business the individual is conducting for the payment of all state taxes normally paid by employers and businesses and has registered for and received a unified business identifier number from the state of Washington; and

(6) On the effective date of the contract of service, the individual is maintaining a separate set of books or records that reflect all items of income and expenses of the business which the individual is conducting.

RCW 51.08.195.

Daniels first argues that summary judgment was inappropriate because under this separate alternative worker definition, there are genuine issues of material fact regarding whether Dr. Auld is a "worker" under the Act, despite his employment agreement with the Seahawks. To benefit from this alternative, Daniels must raise genuine issues of material fact as to each of the six elements. But he fails to do so because he cites nothing in the record regarding either the fourth or fifth factors. Indeed, the record makes it clear that Dr. Auld did not file a schedule of expenses with the Internal Revenue Service for his work with the team.[2] Neither did Dr. Auld establish an account with the Depart-

---

[2] At his deposition, Dr. Auld testified:

ment of Revenue or other state agencies for tax purposes, or acquire a "unified business identifier number" from the State.[3] Consequently, we conclude there are no genuine issues of material fact with respect to RCW 51.08.195's alternative exception to worker immunity. Because Daniels does not meet the Act's alternative worker exception, we next consider whether Dr. Auld was a worker in the same employ as Daniels under the IIA.

In *Kerr v. Olson*, 59 Wn. App. 470, 798 P.2d 819 (1990), we decided whether independently contracted plant physicians were immune under the IIA from a negligence suit brought by a co-worker employee. Kaiser Aluminum & Chemical Corporation owned and maintained an onsite medical dispensary. This dispensary was used exclusively for preemployment medical examinations and treating Kaiser employees' jobsite injuries, free of charge. The company provided all the dispensary's necessary equipment, medicine, and supplies. *Id.* at 471. Two doctors contracted with

---

Q. The fourth thing I'd like to ask you is in 1992 or 1993, were you responsible for filing a schedule of expense with the IRS for your work as a Seattle Seahawk team physician?

A. No, I didn't file any expenses.

Q. Who was responsible for that?

A. The Seahawks were.

Clerk's Papers at 256; *see also* Clerk's Papers at 39-40.

[3]Dr. Auld testified at his deposition:

Q. The fifth thing I'd like to ask you is, in 1992 or '93, since 1992 up to the present time, have you established an account with the Washington State Department of Revenue for your work as a Seattle Seahawk?

A. No.

Q. Have you established any account with any other Washington state agency for your business as a Seattle – or for the work you do as a Seattle Seahawk team physician?

A. No.

Q. Have you registered or received a Unified Business Identifier number as a Seahawk team physician?

A. No.

Clerk's Papers at 256-57; *see also*, Clerk's Papers at 39-40.

Kaiser as plant physicians; their contracts expressly provided the doctors were independent contractors. Each doctor maintained his own professional liability insurance and paid his own workers' compensation premiums. They were paid by the hour and on a part-time basis. Each doctor also had private practices outside of their contracts with Kaiser. *Id.* at 471-72.

At trial, the doctors successfully moved for summary judgment under the IIA, claiming co-worker immunity. We affirmed, agreeing with the physicians that the "essence" of their contracts with Kaiser was their personal labor. *Id.* at 476-77. Applying the criteria enunciated in *White v. Department of Labor & Indus.*, 48 Wn.2d 470, 294 P.2d 650 (1956) and *Lloyd's of Yakima Floor Ctr. v. Department of Labor & Indus.*, 33 Wn. App. 745, 662 P.2d 391 (1982), we held "the services of a physician whether engaged in the employment of the employer or working under an independent contract, which is to render personal service, qualifies for third party immunity pursuant to RCW 51.24.030(1)." *Kerr,* at 477.

Dr. Auld argues that under *Kerr,* he is entitled to summary judgment as a matter of law. But Daniels urges us to distinguish *Kerr* because we did not reach our holding without first evaluating whether the essence of the physicians' contract with Kaiser was for personal labor. He contends that such an inquiry reveals genuine issues of material fact requiring summary judgment to be reversed. But this "essence" inquiry is appropriate only with respect to independent contractors. *See, e.g., White,* 48 Wn.2d 470 (parties conceded independent contract relationship); *see generally, Manor v. Nestle Food Co.,* 131 Wn.2d 439, 450 n.5, 932 P.2d 628 (1997), *cert. denied,* 118 S. Ct. 1574, 140 L. Ed. 2d 807 (1998). And taking all the facts and reasonable inferences in the light most favorable to Daniels, reasonable minds would come to one conclusion: Dr. Auld was

the Seahawks' employee, not an independent contractor.[4] Applying our holding in *Kerr*, we conclude summary judgment was appropriate.

Dual Capacity and Dual Persona Doctrines

In the alternative, Daniels argues that either the "dual capacity" or "dual persona" doctrines prohibit IIA immunity here. The "dual capacity" doctrine may defeat workers' compensation immunity when an employee acts in a capacity outside the employer-employee relationship, and this additional capacity may impose obligations separate from those imposed as an employer. *See Corr v. Willamette Indus., Inc.*, 105 Wn.2d 217, 219, 713 P.2d 92 (1986) (citation omitted). But in *Kerr* at 477 n.4, we rejected the dual capacity doctrine in similar circumstances.

■ Under the "dual persona" doctrine, "[a]n employer may become a third person, vulnerable to tort suit by an employee, if—and only if—he possesses a second persona so completely independent from and unrelated to his status as employer that by established standards the law recognizes it as a separate legal person." 2A ARTHUR LARSON, WORKMEN'S COMPENSATION § 72.81, at 14-229 (1988). In *Evans v. Thompson*, 124 Wn.2d 435, 441, 879 P.2d 938 (1994), our Supreme Court recently recognized this doctrine. There, the plaintiffs sued the defendants as individuals because they owned the land upon which the plaintiffs' spouses were fatally injured. *Id.* at 438. In finding genuine issues of material fact regarding whether the defendants, who were

---

[4]An employee has entered an employer-employee relationship in the workers' compensation context when: (1) the employer controls the employee's physical conduct in performing his duties, and (2) the employee consents to this relationship. *See Novenson v. Spokane Culvert & Fabricating Co.*, 91 Wn.2d 550, 553, 588 P.2d 1174 (1979) (citing *Marsland v. Bullitt Co.*, 71 Wn.2d 343, 428 P.2d 586 (1967); *Fisher v. City of Seattle*, 62 Wn.2d 800, 384 P.2d 852 (1963)). Applying this test, there are no genuine issues of material fact. The employment agreement controlled Dr. Auld's physical conduct in performing his duties for the Seahawks, and Dr. Auld clearly desired, and consented to, the employment relationship. *See* Clerk's Papers at 219. We recognize that despite the Seahawks' physical control over Dr. Auld's agreed upon functions, Dr. Auld is solely responsible for exercising his independent medical judgment. But we decline to carve an exception out of this test for physicians merely because they retain control over their professional judgment.

also corporate shareholders, officers, and directors, were co-employees under the IIA, the Court examined analogous case law from other jurisdictions. *But cf. Folsom v. Burger King*, 135 Wn.2d 658, 668-69, 958 P.2d 301 (1998) (distinguishing *Evans* and declining to apply dual persona doctrine where plaintiff alleged separate employer entity as landowner). But we find the facts in *Evans* and this case are worlds apart and, therefore, decline to extend *Evans* here.

Affirmed.

BAKER and BECKER, JJ., concur.

Review denied at 137 Wn.2d 1016 (1999).